MEG:AS/MJJ
F.# 2017R01198

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A GRAY APPLE IPHONE 7 MODEL NO. A1586, IMEI NO. 354431062902688 CURRENTLY LOCATED IN THE EASTERN DISTRICT OF NEW YORK | APPLICATION FOR A SEARCH WARRANT FOR AN ELECTRONIC DEVICE<br><br>Case No.    18 MJ 207 |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Luke B. Hardison, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.     I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have been a Special Agent for approximately five years; I investigate organized crime and violent crime, among other things. These investigations are conducted both overtly and covertly, and have involved electronic and wire communications. I am familiar with the facts and circumstances set forth below from my participation in the investigation; my review of the

investigative file, including the defendants' criminal history records; and from reports of other law enforcement officers involved in the investigation.

3.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4.      The property to be searched is a cellular telephone that was seized from RUSLAN REIZIN at the time of his arrest from his vehicle. It is a Gray Apple iPhone 7 Model No. A1586, IMEI No. 354431062902688, hereinafter the "SUBJECT TELEPHONE." The SUBJECT TELEPHONE is currently located in the Eastern District of New York.

5.      The applied-for warrant would authorize the forensic examination of the SUBJECT TELEPHONE for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

6.      The FBI arrested defendants RUSLAN REIZIN and MARK KRIVOI between November 28 and November 29, 2017. They were charged by affidavit and complaint (the "Complaint") with participating in an extortion conspiracy, in violation of 18 U.S.C. 1951(a). The Complaint is attached and incorporated by reference herein. On February 26, 2018, the defendants were indicted on extortion and kidnapping charges (together the "SUBJECT OFFENSES"), the latter under 18 U.S.C. § 1201(a)(1).

2

7.     In summary, and as relevant to the instant application, the Complaint set forth the following:  REIZIN and KRIVOI extorted a victim (the "Victim") who had worked for REIZIN since approximately the summer of 2016; the extortion began after the Victim started a business that competed with REIZIN's cleaning company; on May 22, 2017, REIZIN called the Victim (from telephone number 347-221-4379 (the "4379 Number")) and, in a recorded call, told the Victim, in sum and substance, that they had to meet to "seriously resolve the issue [or] [o]therwise it could for real be fucking horrendous";[1] later in the day, the Victim met with REIZIN and KRIVOI and was taken in Krivoi's vehicle to a separate location where REIZIN and KRIVOI assaulted him and brandished a knife; the Victim reported the incident to the FBI, and the FBI began making controlled payments with the Victim to REIZIN.

8.     Throughout this investigation, the FBI has been aware of only one telephone used by REIZIN—i.e., the telephone assigned the 4379 Number—for which the FBI obtained historical and prospective location information as well as a wiretap.  There is reason to believe that the telephone assigned the 4379 Number is the SUBJECT TELEPHONE. First, cell site data show that the telephone assigned the 4379 Number was in the same approximate location as KRIVOI's and the Victim's phones at around the time of the May 22

---

[1] As in the Complaint, most of REIZIN's statements quoted throughout this affidavit were made partially in English and Russian. This and all other English translations of Russian language statements are set forth in draft form. In addition, my review of the recorded calls and meetings is based on reading the draft transcripts. Although I have also been present for and reviewed video of meetings, I have not reviewed the audio of the meetings or the calls for content because I do not speak Russian.

assault. As the Complaint explains, after the assault, REIZIN continued using the telephone assigned the 4379 Number (which was saved in the Victim's phone as "Ruslan")—both by calling and receiving calls, and by receiving and sending text messages[2]—to set up meetings to receive monthly extortion payments. Second, the SUBJECT TELEPHONE was the only telephone seized at the time of REIZIN's arrest. Third, the prospective location information the FBI was obtaining on the 4379 Number at the time of REIZIN's arrest showed that the telephone assigned the 4379 Number was in the same approximate location as the SUBJECT TELEPHONE when it was seized. For these reasons (and those set forth in the Complaint) I submit that there is probable cause to believe that the SUBJECT TELEPHONE is assigned the 4379 Number and that there is probable cause to believe that fruits, instrumentalities and evidence of the SUBJECT OFFENSES will be found on the SUBJECT TELEPHONE.[3]

---

[2] A review of the Victim's messages with REIZIN showed messages appearing both in blue and green, which I know, based on training and experience, means that REIZIN had an iPhone and was capable of sending iMessages (sent over cellular data or WiFi) as well as text messages (or SMS messages). In addition, REIZIN sent text messages to the Victim in connection with the extortion scheme—for example, "I'm waiting for your phone calls" and "why did you not call me yet"—providing probable cause to believe that text messages contain evidence of criminal activity.

[3] In addition, subscriber information detail received from the service provider indicates that the 4379 Number had the same IMEI digits except for the last digit found on the exterior of the SUBJECT TELEPHONE. The subscriber information lists the 4379 Number as having IMEI 354431062902680, while the exterior of the SUBJECT TELEPHONE appears to list 354431062902688. I am not aware of a reason for this slight discrepancy. For the reasons set forth above, however, I submit that there is still probable cause to believe that the phone assigned the 4379 Number and used by REIZIN throughout the investigation is the SUBJECT TELEPHONE. But even if the SUBJECT TELEPHONE was not assigned the 4379 Number, I submit that there is probable cause to believe it contains fruits, instrumentalities and evidence of the SUBJECT OFFENSES because, as set forth above, REIZIN has used at least one cell phone to commit such crimes and the SUBJECT TELEPHONE was seized at the time of his arrest when he believed the extortion was still ongoing.

9.      Based in part on this information, on October 30, 2017, the Honorable Paul G. Gardephe, District Judge for the Southern District of New York, authorized a Title III wiretap interception over the telephone assigned the 4379 Number, used by REIZIN to commit the SUBJECT OFFENSES.  The Order signed by Judge Gardephe also allowed the FBI to collect information about the prospective location of REIZIN's phone.  Subsequent interceptions showed REIZIN discussing other criminal conduct.  For example, on November 14, 2017, a caller asked REIZIN his thoughts on hiring someone to hurt another person, to which REIZIN responded, "you would serve more time [in prison] hiring than if you go do it yourself." The next day, Reizin made a similar, casual reference to violence, remarking that another person was "great . . . to hang out with, to beat someone up with, and to rob someone, but that's it."  REIZIN has also had conversations regarding large sums of money with Boris Goldberg, who has a prior racketeering conviction in this district.[4]  In a conversation with Goldberg on November 15, 2017, for example, Goldberg told Reizin that if the money did not come from an individual who was supposed to be sending it from Chicago, "I will take his eye out." Reizin confirmed: "No, it has to be tomorrow 100% because otherwise there is a fucking situation and will have to fucking go to them." In a call

---

[4] Goldberg, who is believed to be Reizin's stepfather, was prosecuted in the Eastern District of New York for racketeering that included, among other predicate acts, conspiracy to commit murder. He was convicted of a racketeering conspiracy under 18 U.S.C. § 1962(c) and received a 15-year sentence. See United States v. Goldberg, 91-CR-989 (EHN). As part of his guilty plea, Goldberg admitted to extorting a business and conspiring to distribute a significant amount of cocaine. See Goldberg v. United States, No. 94-CV-2884, 1995 U.S. Dist. LEXIS 22185 (E.D.N.Y. Feb. 15, 1995). Following an evidentiary hearing, the Honorable Eugene H. Nickerson concluded that Goldberg was the leader of the criminal enterprise. Id. at *3.

with another person, Reizin appeared to recount a conversation he had about waiting for the money: "Tonight, if I don't have the money, we have a fucking serious problem." In short, I submit that communications intercepted from the telephone assigned the 4379 Number further confirms that there is probable cause to believe that REIZIN has used the SUBJECT TELEPHONE to discuss criminal activity.

10.     The SUBJECT TELEPHONE is currently in the lawful possession of the FBI. As set forth above, it came into the FBI's possession during REIZIN's arrest pursuant to a warrant, which occurred after his vehicle was stopped by the New York City Police Department. I am informed that REIZIN was the only person in the vehicle. In addition, as set forth above, the FBI was receiving information about the prospective location of the telephone assigned the 4379 Number, which had been subject to interception and which REIZIN had used to commit the SUBJECT OFFENSES. The approximate location revealed by that Order matched the approximate location of the SUBJECT TELEPHONE at the time of the arrest.

11.     The SUBJECT TELEPHONE has been held at storage in an FBI evidence facility. In my training and experience, I know that the SUBJECT TELEPHONE has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same condition as they were when the SUBJECT TELEPHONE first came into the possession of the FBI.

6

## TECHNICAL TERMS

12.     Based on my training and experience, I use the following technical terms to
convey the following meanings:

  a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular
      telephone) is a handheld wireless device used for voice and data
      communication through radio signals.  These telephones send signals through
      networks of transmitter/receivers, enabling communication with other wireless
      telephones or traditional "land line" telephones.  A wireless telephone usually
      contains a "call log," which records the telephone number, date, and time of
      calls made to and from the phone.  In addition to enabling voice
      communications, wireless telephones offer a broad range of capabilities.
      These capabilities include: storing names and phone numbers in electronic
      "address books;" sending, receiving, and storing text messages and e-mail;
      taking, sending, receiving, and storing still photographs and moving video;
      storing and playing back audio files; storing dates, appointments, and other
      information on personal calendars; and accessing and downloading
      information from the Internet.  Wireless telephones may also include global
      positioning system ("GPS") technology for determining the location of the
      device.

  b.  Digital camera:  A digital camera is a camera that records pictures as digital
      picture files, rather than by using photographic film.  Digital cameras use a

variety of fixed and removable storage media to store their recorded images.
Images can usually be retrieved by connecting the camera to a computer or by
connecting the removable storage medium to a separate reader. Removable
storage media include various types of flash memory cards or miniature hard
drives. Most digital cameras also include a screen for viewing the stored
images. This storage media can contain any digital data, including data
unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a
handheld digital storage device designed primarily to store and play audio,
video, or photographic files. However, a portable media player can also store
other digital data. Some portable media players can use removable storage
media. Removable storage media include various types of flash memory cards
or miniature hard drives. This removable storage media can also store any
digital data. Depending on the model, a portable media player may have the
ability to store very large amounts of electronic data and may offer additional
features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display
its current location. It often contains records the locations where it has been.
Some GPS navigation devices can give a user driving or walking directions to
another location. These devices can contain records of the addresses or
locations involved in such navigation. The Global Positioning System

(generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

13.  Based on my training, experience, and research, and from consulting the manufacturer's advertisements, I know that the SUBJECT TELEPHONE has capabilities that allow it to serve as "a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA." In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device. In addition, such examination—especially of photographs— may reveal association evidence, including between KRIVOI and REIZIN, who (according

10

to Customs and Border Protection travel records) traveled to Cuba and the Dominican Republic together in the summer of 2017.

## **ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

14. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

15. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

  a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file.

  b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

11

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f. I know that when an individual uses an electronic device to commit the SUBJECT OFFENSES, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because, as set forth above, there is probable cause to believe that the SUBJECT TELEPHONE is the phone REIZIN used as a means of

12

committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

16.     *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the SUBJECT TELEPHONE consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

17.     *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

13

## **CONCLUSION**

18.     I submit that this affidavit supports probable cause for a search warrant

authorizing the examination of the SUBJECT TELEPHONE described in Attachment A to

seek the items described in Attachment B.

Respectfully submitted,

Luke B. Hardison
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on M_____ 2018.

THE_____ . LEVY
UNI_____ TE JUDGE
EAS_____ YORK



14

## **ATTACHMENT A**

The property to be searched is a cellular telephone that was seized from RUSLAN REIZIN at the time of his arrest from his vehicle. It is a Gray Apple iPhone 7 Model No. A1586, IMEI No. 354431062902688, hereinafter the "SUBJECT TELEPHONE." The SUBJECT TELEPHONE is currently located in the Eastern District of New York.

This warrant authorizes the forensic examination of the SUBJECT TELEPHONE for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.      All records on the SUBJECT TELEPHONE described in Attachment A that relate to violations of 18 U.S.C. §§ 1201(a)(1) (kidnapping) and 1951(a) (extortion) (hereinafter the "SUBJECT OFFENSES"), and involve Mark Krivoi and Ruslan Reizin, from June 1, 2016 to November 29, 2017, including:

     i.   Any communication or evidence of communication by, among and and between Mark Krivoi, Ruslan Reizin, unnamed co-conspirators and victim(s);

     ii.   Information identifying any co-conspirators or victim(s);

     iii.   Any digital copies or files of notes, logs or ledgers, including records pertaining to the receipt and/or redistribution of any money or other item of value obtained from any victim(s);

     iv.   All bank records, checks, credit card bills, account information, and other financial records;

     v.   Names and telephone numbers, as well as the contents of all call logs, contact lists, text messages, emails (including those sent, received, deleted and drafted), instant messages, photographs, videos, Facebook posts, FaceTime logs, Google Voice calls, Internet activity (including browser history, web page logs, and search terms entered by the user), and other electronic media constituting evidence, fruits or instrumentalities of the SUBJECT OFFENSES;

     vi.   Evidence of user attribution showing who used or owned the SUBJECT TELEPHONE at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

     vii.   Evidence of software that would allow others to control the SUBJECT TELEPHONE, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

     viii.   Evidence of the lack of such malicious software;

     ix.   Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the SUBJECT TELEPHONE;

     x.   Evidence of the times the SUBJECT TELEPHONE was used;

     xi.   Passwords, encryption keys, and other access devices that may be necessary to access the SUBJECT TELEPHONE; and

     xii.   Contextual information necessary to understand the evidence described in this attachment, all of which constitutes evidence, fruits and instrumentalities of the SUBJECT OFFENSES;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been

created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

MEG:AS/MJJ
F.# 2017R00198

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA        C O M P L A I N T

       - against -        (18 U.S.C. § 1951)

RUSLAN REIZIN and
MARK KRIVOI,

       Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

EASTERN DISTRICT OF NEW YORK, SS:

       Luke B. Hardison, being duly sworn, deposes and states that he is a Special

Agent with the Federal Bureau of Investigation, duly appointed according to law and acting

as such.

       On or about and between May 22, 2017 and November 28, 2017, within the

Eastern District of New York and elsewhere, the defendants RUSLAN REIZIN and MARK

KRIVOI did knowingly and intentionally conspire to obstruct, delay and affect commerce,

and the movement of articles and commodities in commerce, by extortion, in that REIZIN

and KRIVOI agreed to obtain property, to wit: proceeds of a commercial business, from an

individual, by extortion.

       (Title 18, United States Code, Section 1951)

Case 1:18-mj-00207-RML   Document 1   Filed 03/08/18   Page 19 of 31 PageID #: 19
Case 1:17-mj-01013-RLM   Document 1   Filed 11/29/17   Page 2 of 14 PageID #: 2

2

The source of your deponent's information and the grounds for his belief are as follows:[1]

1.  I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have been a Special Agent for approximately five years; I investigate organized crime and violent crime, among other things.  These investigations are conducted both overtly and covertly.  I am familiar with the facts and circumstances set forth below from my participation in the investigation; my review of the investigative file, including the defendants' criminal history records; and from reports of other law enforcement officers involved in the investigation.

2.  As set forth below, there is probable cause to believe that RUSLAN REIZIN and MARK KRIVOI have extorted a victim (the "Victim"),[2] and assaulted the Victim in furtherance of the extortion.  During interviews with the FBI, the Victim stated that he met an individual named "Ruslan" in or around the summer of 2016.[3]  He further stated that Ruslan owns an awning-cleaning business in Brooklyn and that, in or about 2016, the Victim began working for Ruslan on a commission basis.  As discussed in more detail below, the FBI has confirmed through the Victim and through surveillance that the individual

---

[1] Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

[2] The Victim has not received any benefits, other than the extortionate money he has paid REIZIN and protection he receives during these payments.

[3] This and all other statements of the Victim to the FBI are set forth in substance and in part.

Case 1:18-mj-00207-RML   Document 1   Filed 03/08/18   Page 20 of 31 PageID #: 20
Case 1:17-mj-01013-RLM   Document 1   Filed 11/29/17   Page 3 of 14 PageID #: 3

3

known to the Victim as "Ruslan" is RUSLAN REIZIN, and that REIZIN's co-conspirator

who assaulted the Victim is MARK KRIVOI.[4]

        3.      The Victim further stated that he stopped working for REIZIN in

approximately the summer of 2016 and that around that same time, the Victim started his

own cleaning business in New York City, including in Brooklyn, Queens, and the Bronx,

which has continued to operate during REIZIN's extortion of the Victim, albeit in a reduced

capacity because of REIZIN's threats.  REIZIN appeared to have learned about the business

in the spring of 2017.  According to the Victim, on or about May 22, 2017, the Victim

received two voicemails from REIZIN, who was using a telephone with the number 347-221-

4379 assigned (the "REIZIN Phone").  Toll analysis and analysis of the Victim's phone

confirmed that the calls were placed from the REIZIN Phone to the Victim's telephone that

day.  The Victim stated that he knew the voicemails were from REIZIN, in part, because he

saw that the calls came from a telephone number that is saved as "Ruslan" in his phone[5] and

in part because he recognized REIZIN's voice.

---

[4] Because the Victim was well acquainted with REIZIN by the time of his assault, the FBI showed the Victim a photobook in which he identified REIZIN. The Victim identified KRIVOI in a photo array as the individual who, as described below, assaulted him on or about May 22, 2017. The photo array procedure was conducted by an agent who did not know the identities of the targets of this investigation, including REIZIN and KRIVOI. Database searches revealed that a red Dodge Ram—matching the description of the automobile that the Victim stated he saw KRIVOI driving on or about May 22, 2017—is registered to KRIVOI. In addition, in or about July 2017, agents conducting physical surveillance in Brooklyn, New York observed a red Dodge Ram in the vicinity of KRIVOI's residence.

[5] The FBI has confirmed, by examining the Victim's phone, that the REIZIN Phone is saved as "Ruslan" in the Victim's phone, and that each one of the voicemails that the Victim received came from the REIZIN Phone. Subscriber information subpoenaed for the REIZIN Phone shows that the telephone is registered to "Ruslan Reizin."

Case 1:18-mj-00207-RML   Document 1   Filed 03/08/18   Page 21 of 31 PageID #: 21
Case 1:17-mj-01013-RLM   Document 1   Filed 11/29/17   Page 4 of 14 PageID #: 4

4

4.     Law enforcement subsequently obtained copies of these voicemail

recordings.[6]   In one voicemail, REIZIN stated the following:

> Hello [reference to the Victim].   This is Ruslan.   342—sorry,
> 347-221-4379 [the REIZIN Phone].   Call me back.   I have a
> big problem with you.   We have a serious situation.   Call me
> back immediately.

In the second voicemail, REIZIN stated the following:

> Hello, [unintelligible].   It is best that you call me back.   You
> already understand what this conversation is about.   Better off
> you call me so that I don't have to set up your fucking monkey
> ass and then create different problems.   Give me a call.   We
> have to settle certain things, bro.   347-221-4379 [the REIZIN
> Phone], Ruslan.

5.     Later that day, after receiving the voicemails, the Victim used his

telephone to call REIZIN on the REIZIN Phone.   A review of the historical tolls for the

REIZIN Phone shows that it had multiple communications with the Victim's telephone on

this day.   I have reviewed a transcript of a recorded call between REIZIN and the Victim,

during which the following exchange occurred:

> REIZIN:     Hello [unintelligible]
>
> VICTIM:     Yes, what's up, Ruslan?
>
> REIZIN:     Yes. I wanted to tell you that we need to meet, to
>             chat a bit.
>
> VICTIM:     Regarding?

---

[6] Most of REIZIN's statements quoted throughout this Affidavit were made
partially in English and Russian.   This and all other English translations of Russian language
statements are set forth in draft form.   In addition, my review of the recorded calls and meetings
is based on reading the draft transcripts.   Although I have also been present for and reviewed
video of two meetings, I have not reviewed the audio of the meetings or the calls for content
because I do not speak Russian.

Case 1:18-mj-00207-RML   Document 1   Filed 03/08/18   Page 22 of 31 PageID #: 22
Case 1:17-mj-01013-RLM   Document 1   Filed 11/29/17   Page 5 of 14 PageID #: 5

5

REIZIN:     Regarding your new job, credit card application,
            where you go through my accounts, open
            accounts [unintelligible]—

VICTIM:     Wait, which ones?

REIZIN:     When you leave my business you will not be
            doing this.   This was our agreement.   I explained
            it because I am feeding my family in the
            neighborhood and I have a couple of fucking
            crippled people like you.   You cannot do what I
            am doing, especially in my neighborhood.   We
            have to meet and seriously resolve the issue.
            Otherwise it could for real be fucking horrendous.
            I fucking respected you until now, until you
            started to steal from me in this way.   If I needed
            to hurt you I would have done it differently.
            Today I just want to talk.   If you don't
            understand it in a nice way, we will have the most
            serious problems.   I don't want it to go that way.
            You are a good guy but we have to fucking sit
            down and talk.   You fucked up, man.

VICTIM:     Well, we can sit down and talk.   When do you
            want to talk?

REIZIN:     I will now finish my meeting.   I don't know how
            many hours.   Let's do it closer to five.

VICTIM:     Okay.

REIZIN:     I will call you.   We will meet for coffee and will
            shoot the breeze.

VICTIM:     Okay.

REIZIN:     Bye.

VICTIM:     Bye.

6.      According to the Victim, the following occurred later that day: REIZIN

called the Victim while the Victim was at a restaurant in Brooklyn and told the Victim to

meet REIZIN outside the restaurant.   The Victim went outside the restaurant and saw

Case 1:18-mj-00207-RML   Document 1   Filed 03/08/18   Page 23 of 31 PageID #: 23
Case 1:17-mj-01013-RLM   Document 1   Filed 11/29/17   Page 6 of 14 PageID #: 6

6

REIZIN in a van. Another individual, later identified as MARK KRIVOI, was also present,

in a red Dodge Ram (the "Dodge Ram"). REIZIN told the Victim to get inside the Dodge

Ram.[7] REIZIN, KRIVOI and the Victim then drove in the two vehicles to a nearby

location. After arriving at that location, REIZIN got out of his vehicle, grabbed the Victim

and brought him to some nearby trees. KRIVOI followed them. REIZIN then brandished a

knife and told the Victim that "Bratva" sent him and that the Victim had a choice of getting

his ear cut or his neck cut.

7.      Bratva is a Russian word that translates to "brotherhood." A publicly

accessible website that purports to be run by Bratva confirms that Bratva is an organization

of motorcycle riders and states that fluency in Russian is required for membership.[8] During

the course of this investigation, the FBI has observed riders on motorcycles in and around the

Sheepshead Bay neighborhood in Brooklyn wearing vests with the word "BRATVA" printed

on them. According to the Victim, REIZIN had referenced Bratva in earlier conversations

to suggest that REIZIN could draw on the organization's members to commit violent acts.

8.      During the same incident, after telling the Victim that Bratva sent him,

REIZIN told the Victim that he had a third option: to not work in Brooklyn anymore and to

pay $10,000 to REIZIN and to Bratva. REIZIN later "reduced" the payment to $5,000,

which REIZIN stated the Victim could pay in monthly installments to REIZIN. The Victim

told REIZIN that he could not afford to pay this amount. In Russian, REIZIN then directed

---

[7] This and all other statements of REIZIN as recalled by the Victim are set forth
in part and in substance.

[8] Available at http://bratvamc.com/about-the-club-english.html.

Case 1:18-mj-00207-RML   Document 1   Filed 03/08/18   Page 24 of 31 PageID #: 24
Case 1:17-mj-01013-RLM   Document 1   Filed 11/29/17   Page 7 of 14 PageID #: 7

7

KRIVOI—whom he had previously described as his "soldier"—to hit the Victim, which

KRIVOI did multiple times. The Victim relented, telling REIZIN he would pay; KRIVOI

stopped hitting the Victim. REIZIN indicated that he would harm the Victim's family if the

Victim went to the police, and that even if he is arrested, that he would make bail and come

after him and his family. KRIVOI then drove the Victim away from the location in the

Dodge Ram.

9. On or about June 28, 2017, during a recorded call between REIZIN and

the Victim, REIZIN tried to pressure the Victim into meeting him at his preferred location: "I

am on 37th and Flatlands." In response, the Victim stated, "This time, let's meet at some

decent [unintelligible]." REIZIN persisted in pressuring the Victim to come to his preferred

location:

> You and I have a fucking agreement. It hurts me, it's
> unpleasant for me, but an agreement is an agreement. I am just
> fucking training right now and I don't feel like stopping training
> to run somewhere, stopping training and stopping a class to
> come to see you. You see, I'll just come down and take it from
> you until the next month. If I told you that [unintelligible]. You
> don't understand that it's a job. [Victim], you think that if you
> don't—if I have to reach you, that the only way I can do it is for
> you to come to me? Only that way, or what do you think, are
> there other ways of finding you? I don't fucking need this,
> [Victim]. I made an agreement with, you, you keep your word,
> I keep my word. Do whatever you want with me. I am asking
> you seriously. [Unintelligible - recording cut out] in Brooklyn.
> You gave me your word that you won't do it. You and I do not
> have any problems. I cannot have you, Bratva won't allow me
> not to give you.

Based on my training and experience and knowledge of this investigation, I

believe that in the first part of REIZIN's response, REIZIN confirmed the terms of the

agreement he had with the Victim that the Victim refrain from working in Brooklyn and pay

Case 1:18-mj-00207-RML   Document 1   Filed 03/08/18   Page 25 of 31 PageID #: 25
Case 1:17-mj-01013-RLM   Document 1   Filed 11/29/17   Page 8 of 14 PageID #: 8

8

REIZIN money ("You and I have a fucking agreement."). REIZIN also promised the

Victim that he would not be assaulted again if the Victim follows the agreement ("nothing is

going to happen to you"), and that REIZIN had other ways to reach the Victim even if the

Victim did not come to meet him ("if I have to reach you, that the only way I can do it is for

you to come to me?"). Later in the call, the Victim and REIZIN continued discussing the

location of the meeting, finally picking the Roll-N-Roaster restaurant ("Roll-N-Roaster

restaurant"), located at 2901 Emmons Avenue, in Brooklyn, New York.

      10.    After this call, the Victim met with REIZIN in Brooklyn to pay the

$200 monthly payment (supplied by the FBI), while the agents conducted surveillance.[9]

      11.    During the recorded meeting between REIZIN and the Victim, REIZIN

reiterated his demand that the Victim not work in Brooklyn, stating, for example, "You are

taking my bread away from me and my family. This is a problem. Do you understand

what I mean?" Later during the conversation, REIZIN told the Victim that his stepfather

will not be able to assist him: "You think this little half-faggot married your mother—he's

not going to help you, at all. Got it? When his ear is fucking cut out and he will be forced

to chew it and swallow it, and they will dump his fucking shitty car in the garbage—he will

be singing a very different tune."

      12.    REIZIN also stated that the $200 payment was "obshchak"—a Russian

word that roughly translates to "tribute"—to Bratva. REIZIN has identified himself as a

---

[9] Prior to and after each recorded meeting described above, law enforcement
personnel searched the Victim to confirm that he had no contraband, and that he returned without
the $200 supplied by the FBI. As described in this Affidavit, the Victim's reliability has been
established, in part, through recordings and cell-site evidence.

Case 1:18-mj-00207-RML   Document 1   Filed 03/08/18   Page 26 of 31 PageID #: 26
Case 1:17-mj-01013-RLM   Document 1   Filed 11/29/17   Page 9 of 14 PageID #: 9

9

member of Bratva, stating, for example, that his house in New Jersey is co-owned by another

member of Bratva, and, on at least one occasion, wearing a Bratva t-shirt when collecting a

payment from the Victim. In addition, in 2015 and 2016 (as recently as August 2016),

NYPD license plate readers show a male driving motorcycles with a Bratva jacket in

Brooklyn, New York, around the vicinity of where REIZIN resides. The motorcycles are

registered to REIZIN, and the license plate on at least one of them reads "RUSIK," which I

am informed is short for "Ruslan" (REIZIN's first name) in Russian.

13.     During this meeting, REIZIN stated that members of Bratva put

money into Bratva's *obshchak* reguarly. REIZIN then explained some of the purposes for

which Bratva uses the money:

> REIZIN:     This money are going to be send away—this
> money would go to *obshchak* [unintelligible].
> You know, I didn't fucking make any money
> here.
>
> VICTIM:     This money [unintelligible].
>
> REIZIN:     It's not my money.   This money goes to
> *obshchak* where we divide them.   We do our
> business, whatever we need there—um, people
> [unintelligible] to the guys who are in trouble, to
> the guys who fall into disgrace.   We also finance
> parties with this money so it happens sometime
> that [unintelligible] but money allocated for some
> penalty the money that we're spending together
> for some other businesses—well, that is
> *obshchak*.

14.     Text messages reviewed by the FBI from the Victim's telephone show

communication between the Victim and REIZIN on or about July 23, 2017. For example, in

one message the Victim asked "Can I call you later?"   A little over an hour later, REIZIN

wrote in a text message, "I'm waiting for your phone calls" and "Why did you not call me

Case 1:18-mj-00207-RML   Document 1   Filed 03/08/18   Page 27 of 31 PageID #: 27
Case 1:17-mj-01013-RLM   Document 1   Filed 11/29/17   Page 10 of 14 PageID #: 10

10

yet?" At the direction of agents, the Victim placed a monitored call to REIZIN to discuss arrangements for the delivery of the second installment payment.

15.   The following day, on July 24, 2017, the Victim spoke with REIZIN by telephone again.  During this phone call, the Victim asked to push the meeting to 8:30 ("Will 8:30 be okay?").  REIZIN responded by insisting on meeting at his house instead of the Roll-N-Roaster restaurant.  The Victim stated that he would call back, at which point he discussed with the agents potentially meeting REIZIN at his residence.  Because of safety concerns, the agents advised the Victim to resist doing so and insist on meeting at the restaurant.  The Victim called REIZIN and stated that he would meet REIZIN at the Roll-N-Roaster restaurant, to which REIZIN responded, "No, we agreed that you would come to my house."  The Victim stated, "Ruslan, I don't feel comfortable," which I believe is a reference to REIZIN's prior assault of the Victim.  REIZIN, however, stated that he would only meet the Victim at his house, and implicitly threatened the Victim if the Victim did not come:   "I won't go to Roll-N-Roaster.   I'm telling you we'll have a problem.   I'll be downstairs, I'm fucking sick of it.   I will not be at Roll-N-Roaster.   I am downstairs.   I'll be at my house in 5 minutes.   That's it, good-bye."   The Victim and agents interpreted this statement ("we'll have a problem") to mean that the Victim would be assaulted again if he did not come to REIZIN's residence.   As a result, the Victim agreed to go to REIZIN's residence.

16.   On or about July 24, 2017, the Victim met with REIZIN near REIZIN's residence in Brooklyn, while agents conducted surveillance.  Following the meeting, the Victim met agents at a predetermined location and informed agents that he gave $200 (supplied by the FBI) to REIZIN.  During the brief meeting, REIZIN could be heard stating in sum and substance, "You owe me 4600?  Did you calculate how it would work?  200

Case 1:18-mj-00207-RML   Document 1   Filed 03/08/18   Page 28 of 31 PageID #: 28
Case 1:17-mj-01013-RLM   Document 1   Filed 11/29/17   Page 11 of 14 PageID #: 11

11

payments for two years." In other words, REIZIN confirmed that after making two $200 payments, the Victim owed $4,600.

17.     On or about August 17, 2017, the Victim called REIZIN to say that he had the $200 monthly payment earlier than usual that month: "I put together a couple hundred. I'm thinking I could give that to you this evening." REIZIN responded that he was in Florida and would be travelling to the Dominican Republic until August 25th, stating that, "We'll see each other on the 26th or the 27th." On August 26, 2017, the Victim called REIZIN and stated that he would be with his family over the weekend and preferred to meet the following week. REIZIN agreed to meet on Tuesday, suggesting, "Around 8:00 by my house, right," which I know meant Tuesday, August 29, 2017 at 8:00 p.m.

18.     On or about August 29, 2017, after a telephone conversation between the Victim and REIZIN, the two arranged to meet in Brooklyn, New York that day, outside of REIZIN's residence for the Victim to make his third installment payment. Law enforcement conducted surveillance of the meeting and recorded a video of the conversation between the two men.

19.     During the recorded meeting, REIZIN told the Victim the following, in sum and substance: "This fucking shit is really serious. Remember we had an agreement and you had a question for me? Basically it was, 'How would I know? If I would give you this five – you won't be going after me?' That was a question, right? I've told you that I will not going to do that, but with one condition – you are not going to fucking work in Brooklyn." Based on my training and experience and familiarity with this investigation, I believe that REIZIN was confirming the extortionate terms of his arrangement with the Victim, which provided that the Victim would not be assaulted again, so long as he

Case 1:18-mj-00207-RML   Document 1   Filed 03/08/18   Page 29 of 31 PageID #: 29
Case 1:17-mj-01013-RLM   Document 1   Filed 11/29/17   Page 12 of 14 PageID #: 12

12

continued to pay Bratva, through REIZIN, and did not operate his cleaning business in Brooklyn.[10]   During this conversation, REIZIN stated that the Victim would "have a problem" if he works in Brooklyn, and that if the Victim has any clients there, "transfer them to me and I will fucking give you 50 percent from work."   During this meeting, REIZIN can be seen and heard counting the installment payment.

20.   On or about September 28, 2017, the Victim made a fourth installment payment to REIZIN.   At approximately 7:25 p.m., the Victim sent REIZIN a text message, "I'm on my way back.  Will be downstairs [sic] your house at 8."   REIZIN responded with a text message stating, "Call me when you [sic] downstairs and I will come down."   I have reviewed a screenshot of both messages from the Victim's telephone and saw that they were sent from the REIZIN Phone, which is saved under "Ruslan" in the Victim's phone.   In addition, REIZIN and the Victim had a brief conversation over the telephone, in which REIZIN confirmed, "I'm downstairs."

21.   The Victim met with REIZIN while law enforcement conducted surveillance.   According to the Victim, REIZIN wore a shirt with the name "Bratva" on it. During the recorded meeting, after the Victim paid another $200 (supplied by the FBI), REIZIN emphasized again to the Victim that he could not work in Williamsburg or Brooklyn more generally, and that he would "fuck up" the Victim if the Victim broke this rule. REIZIN asked the Victim to walk with him to show the Victim REIZIN's new vehicle, but

---

[10] According to the Victim, the Victim uses an automobile, which I am informed was assembled outside the state of New York.   Among the tools he has used, the Victim has used a Dewalt pressure washer and Werner ladder, both of which I am also informed are manufactured outside of New York state.   The Victim explained that he usually purchases his supplies from Home Depot.

Càse 1:18-mj-00207-RML   Document 1   Filed 03/08/18   Page 30 of 31 PageID #: 30
Case 1:17-mj-01013-RLM   Document 1   Filed 11/29/17   Page 13 of 14 PageID #: 13

13

the Victim stated he did not feel safe.   REIZIN told the Victim that if REIZIN wanted to

hurt him, the Victim would not see REIZIN coming.   At the end of the meeting, REIZIN

entered a gray Lexus vehicle that was parked in the vicinity of this location.

22.   On or about November 1, 2017, the Victim made a fifth installment

payment under the same procedure.   During the meeting, REIZIN told the Victim that

REIZIN would be seeing the Victim twice in November, which the Victim understood meant

that the Victim had to make two payments, one toward the end of November.   Towards the

end of the meeting, REIZIN confirmed the agreement (that the Victim would not work in

Brooklyn) again by stating, "Do we understand each other about working in Brooklyn?

Càse 1:18-mj-00207-RML   Document 1   Filed 03/08/18   Page 31 of 31 PageID #: 31
Case 1:17-mj-01013-RLM   Document 1   Filed 11/29/17   Page 14 of 14 PageID #: 14

14

WHEREFORE, your deponent respectfully requests that the defendants

RUSLAN REIZIN and MARK KRIVOI, be dealt with according to law.

_____
Luke B. Hardison
Special Agent
Federal Bureau of Investigation

Sworn to before me this
29 day of November, 2017

_____
THE HONORABLE ROANNE L. MANN
CHIEF UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK